R. W. Goodale and Myrtle L. Goodale, Appellees, v.
Midwest Dairy Products Corporation, Appellant.

Opinion filed June 4, 1934.

STEVENS & HERNDON and JOHN L. KAGY, for appellant.

JUNE C. SMITH, WHAM & WHAM and HUGH V. MURRAY, JR., for appellees.

MR. JUSTICE STONE delivered the opinion of the court.

Prior to April 1, 1927, appellee, R. W. Goodale, was the owner of an ice cream, soda water, bottling and dairy products business in Centralia, Illinois. He operated said business in said city and the territory adjacent thereto within a radius of 150 miles. On March 16, 1927, the parties hereto entered into a written contract for the sale by appellee to appellant of said business, good will, etc. Said contract after making representations as to title, power to convey, minor liens, taxes, bills receivable, examinations by attorneys, etc., none of which is questioned here, proceeds as follows:

"4. In payment for the property herein agreed to be conveyed, purchaser agrees, subject to all provisions of this agreement, upon receipt of proper conveyances thereof, to pay to the vendor, as full purchase price for the same, the sum of Eighty Thousand ($80,000.00) Dollars, to be paid as follows: Twenty Thousand ($20,000.00) Dollars in cash and Six Hundred (600) shares of the par value of One Hundred ($100.00) Dollars each of the preferred capital stock of the Midwest Dairy Products Corporation.

"5. Possession of said property and delivery of said instruments of conveyance and payments of the aforesaid consideration shall be made April 1, 1927. All instruments of conveyance shall be in form ap-

proved by purchaser's attorney and shall include necessary or proper warranty deeds, bills of sale, assignments and/or other instruments of conveyance.

"6. In consideration of the conveyance herein agreed to be made and of the covenants and agreements herein made on the part of the vendor to be kept and performed, purchaser agrees that upon said sale and purchase being consummated in accordance with the terms of this agreement, it will on the 1st day of April in 1928, purchase from vendor at par value plus dividends accrued and unpaid, one hundred fifty (150) shares of said preferred capital stock and will on April 1st of each of the years 1929, 1930 and 1931 also purchase from vendor a like number of shares of said preferred capital stock or par value plus dividends accrued and unpaid.

"7. In consideration of the conveyance herein agreed to be made and of the covenants and agreements on the part of vendor to be kept and performed, purchaser agrees that simultaneously with said purchase and sale the purchaser will execute and deliver to vendor a contract in form to be approved by vendor's attorney for the employment by purchaser of vendor in purchaser's business for a period of one year at a salary of Five Thousand ($5,000.00) Dollars per annum.

"8. Vendor agrees that to secure to the purchaser the said business of vendor and the good will thereof, hereby agreed to be conveyed, it is necessary that purchaser be fully protected from competition in said business by or on behalf of vendor in the territory hereinabove described as tributary to said business; and vendor, in further consideration of the premises and agreements by purchaser herein contained, and for the purpose of enabling the purchaser, its successors and/or assigns to acquire, enter upon, manage, conduct, continue, carry on and enjoy the business herein agreed to be conveyed and the good will thereof, does

covenant and agree to and with the purchaser that upon consummation of said sale in accordance with the terms of this agreement he will not at any time during the period of fifteen (15) years from and after April 1, 1927, directly or indirectly set up, exercise, conduct or be engaged, employed or interested in, or carry on, in said territory or any part thereof, any occupation, interest or profession, similar to or of the same nature with the business hereby agreed to be conveyed and the good will thereof, nor set up, make, carry on or encourage, or be engaged or interested in, any opposition of any kind whatsoever to said business, or become an employe of any person, firm, or corporation engaged in any opposition in said business.

"9. It is expressly understood and agreed that if vendor shall tender transfer and delivery of the property hereby agreed to be conveyed in full accordance with the terms and conditions herein set forth, and purchaser shall fail or refuse to pay to vendor the consideration hereinabove stated in accordance with the terms of this agreement, the amount of the damages accruing to vendor thereby shall be the sum of Twenty Thousand ($20,000.00) Dollars.

On April 1, 1927, appellee delivered title to his premises and business to appellant and appellant paid the $20,000 to appellee and delivered to him the 600 shares of preferred stock described in the contract. The contracts having been thus consummated by performance of the parties, appellant proceeded to operate said business with appellee in charge as its sales manager. We are using the term appellee in the singular because the evidence shows that Myrtle L. Goodale was made a party only because of the title to certain real estate being involved.

Later, on April 18, 1933, appellee brought suit in assumpsit against appellant for the value of the 600 shares of stock with their accumulations, which by sec. 6 of the contract appellant agreed to purchase.

The amended declaration consists of 10 counts— eight original and two additional. The first five counts are the common counts. The first alleged an indebtedness of the appellant to appellees on March 11, 1933, "in the sum of $65,000 for the purchase price of six hundred shares of preferred stock of the Midwest Dairy Products Corporation, of the par value of $100 per share, plus accrued dividends, before that time sold by plaintiffs to the defendant." The second, third, fourth and fifth each alleged an indebtedness "in the sum of $16,000 for the purchase price of one hundred fifty shares of" such stock "sold by plaintiffs to the defendant," and they differed from each other only in their respective dates of April 1 of the years 1928 to 1931, inclusive, when the indebtedness was alleged to have accrued.

The remaining three counts of the declaration as it stood at the time of the trial were each special.

The sixth alleged that on March 16, 1927, appellees "bargained and sold six hundred shares of the preferred capital stock of the Midwest Dairy Products Corporation, of the par value of $100 each, to the defendant" and that appellant had failed to pay appellees therefor in accordance with the terms of a written contract of that date, set forth in full in the count. The seventh alleged that on March 16, 1927, appellees "bargained and sold six hundred shares" of said preferred capital stock to appellant and that notwithstanding appellees' tender of said stock and demand for payment made March 11, 1933, appellant had failed to pay appellees therefor in accordance with the terms of said written contract, likewise set forth in full in this count. The eighth and last of the three special counts alleged that appellees had accepted and received the stock as consideration for the performance of the obligations imposed by the written contract of March 16, 1927, also set forth in full in this count, and that on

said date appellees "bargained and sold six hundred shares" of said stock to appellant, and that notwithstanding plaintiffs' tender of the stock and demand for payment appellant had failed to pay appellees therefor in accordance with the terms of the written contract.

The first of the two additional counts, filed after trial on September 25, alleged a sale by appellees to appellant on March 16, 1927, of appellees' property and business, for a purchase price consisting in part of 600 shares of appellant's preferred capital stock, in accordance with the written contract of that date, set forth in full in the count; that thereafter in March of the following year appellant agreed with appellees that if appellees would not exercise the right given them under the written contract to require appellant to repurchase specific instalments of appellees' stock on specific dates as specified in said written contract, appellant would carry out and perform that contract in all respects except as to time, and would purchase said 600 shares from appellees for the price and consideration fixed by the contract at any time appellees should request that such purchase be made; and that request and demand for purchase of the 600 shares had been made by appellees on March 11, 1933, with tender of the certificates of the stock.

The second additional count alleged a sale by appellees to appellant on March 16, 1927, of appellees' property and business for a purchase price consisting in part of the 600 shares of appellant's preferred capital stock, in accordance with the written contract of that date, also set forth in full in this count; that appellant induced appellees to accept the 600 shares to obtain a temporary extension of the time of payment of $60,000 of the consideration for the sale of appellees' property; that thereafter in March, 1928, and prior to any time fixed by said contract at which appellees might

demand purchase by appellant of any of said stock, appellant agreed with appellees that if appellees would not exercise the right given them under the contract to require appellant to purchase the specific instalments of appellees' stock on specific dates as specified in the contract, appellant would carry out and perform that contract in all respects, except as to time, and would purchase said 600 shares from appellees for the price and consideration fixed by the contract at any time appellees should request that such purchase be made; and that request and demand for purchase of the 600 shares had been made by appellees on March 11, 1933, with tender of the certificates of the stock.

To the amended declaration, appellant filed a plea of non-assumpsit. The case was tried on the issue thus made. While the case was under advisement, appellees by leave of court filed the two additional counts. To these two counts, appellants filed pleas of non-assumpsit and the five-year statute of limitations. The trial court awarded appellees judgment in the sum of $67,839.96. To reverse said judgment appellant appeals.

The controlling question in this case is the nature and character of that part of the contract between the parties which has to do with the repurchase of the 600 shares of stock. Was this an option contract or was it a firm contract binding alike upon the seller and the buyer? Was it such a contract as either party might compel specific performance of? If this was an option contract it was incumbent upon appellees to perform certain acts as a condition precedent to bringing this suit, i. e., presentment and demand for payment within the time prescribed. Appellees do not pretend to have thus performed. On the contrary they contend that such performance if it was necessary, was rendered unnecessary and excusable by the request of appellant.

An option is defined by our courts as a right acquired by contract to accept or reject a present offer within a limited or reasonable time in the future. American and English Enc. of Law (2d Ed.) 924. *Adams v. Peabody Coal Co.*, 230 Ill. 469, 473. Appellee for the consideration of his property received $20,000 in cash and the 600 shares of stock. That is not all he received. He also received a privilege, right, or option to sell said stock to appellant within a specified time at a specified price. He was not bound to accept this. He might do so. Appellant had no enforceable right to purchase this stock. Appellee had the right of election whether he would avail himself of the right which he acquired as a part of the consideration for the sale of his property or whether he would not. His status is thus placed within the scope of the above definition and in harmony with those authorities which afford illustration of optional contracts. Having an optional contract it was incumbent upon him to perform all necessary acts which would consummate a sale, within the time prescribed in his contract. It is conceded that he did not perform those acts. He excuses himself therefrom by saying that he forbore such acts at the behest of appellant by virtue of an oral agreement in and by which for a consideration, he extended time in which for appellant to pay the money and take up the stock in question. We shall deal with this oral agreement later. We are now concerned with a question of pleading. In the first eight counts of appellee's declaration he alleges performance. Not only is there no evidence of performance of the condition precedent to transforming the optional contract into a sale but it is conceded by appellee that he did not perform those acts. The evidence in support of these counts consists of a reason or excuse why he did not perform. This, in itself, is an admission that he did not so perform, much less proof of per-

formance. A declaration of performance is not supported by proof of the reason why performance was not made. The terms are inconsistent.

"There can be no recovery on a contract against one party whose performance is dependent on some act to be done or forborne by the other party unless the condition precedent has been fully or substantially performed by the plaintiff or he has averred and proved a sufficient excuse for non-performance." *Feder v. Midland Casualty Co.*, 316 Ill. 552; *Miller v. Chicago & N. W. Ry. Co.*, 347 Ill. 487.

There being no allegation of waiver of performance in the first eight counts of the declaration, evidence to that effect ought not to have been admitted. Not only is such evidence not proof of performance as alleged in the declaration, but it is not proof of anything averred in the declaration and therefore not competent evidence for any purpose. Far from being a harsh rule, this is a wise provision of the science of pleading. The defendant has a right to know definitely what he has to meet. He can only look to the declaration for this information. Holding as we do that the contract for the sale of this stock was an optional contract fraught with a condition precedent to the bringing of this suit, and there being no proof of the performance of this condition, it seems to us inescapable that there can be no recovery under the first eight counts of the declaration.

Appellee relies upon a further agreement as a reason why he did not demand payment from appellants within the time prescribed in the contract. There is a conflict of evidence on this phase of the case. Appellee testifies that he had a conversation with Hayes in March, 1928, in which the latter told him that they were considering the purchase of other properties, and that if those deals went through it would be hard for them to buy his preferred stock, that was due for

payment April 1st; that Wineberg had made the statement that I would have to be paid on the due date; that he, appellee, laughed at that; that Hayes said he had told Wineberg that if he explained their activities, what they had accomplished etc., he was satisfied it could be managed with appellee; that in this conversation he explained to Hayes why he had the contract made as he did, that he would not take any action that would waive any rights in the payment coming due or any other payment; but that he did not need the money at that time, that it did not have to be paid on that date; that Hayes told him that he would not be waiving any rights in the contract at all, that Hayes said he would see to it personally that appellee was taken care of at all times; that the stock would be paid for on my demand.

Wineberg testified that prior to April 1st of each of the four years in question he asked appellee if he wished to have his stock taken up by the company and on each occasion appellee answered that he did not—that he was well satisfied.

Archie Lehn, treasurer of appellant, testified that he was present at a conversation in the spring of 1929 between Wineberg and Goodale when Wineberg asked Goodale if he wanted to redeem his stock April 1st; that Goodale said, ''No, he was satisfied with his stock and wanted to keep it; that he was well satisfied with the company and wanted to go along with it.'' That on the way to New York Goodale said he was afraid the National Dairy Company would retire his stock.

H. E. Strong, purchasing agent for appellant, testified that on the way to New York, appellee said he was glad he had not cashed in his stock. He would rather have it in a company he was interested in. In Mayfield, Kentucky, appellee said he had taken stock for his plant and that he was well satisfied. This was in March, 1931.

H. E. Stoner, superintendent, says he talked with appellee in Decatur in April, 1931; that appellee there said he had some stock in the Midwest Dairy Corporation and that he would not part with it. He thought it was a good investment.

W. R. Hayes, president and general manager of appellant, testified that he had a conversation with appellee sometime two or three weeks after April 1, 1928; that he had not discussed appellee's stock with him prior to that time. On this occasion, appellee said that Charley Wham had raised the very devil with him for not cashing in his stock before April 1st; that he did not want to sell his stock; that he thought it was a good investment; that Wham had no right to tell him what to do with his stock. Witness further testified that he was present in the office of appellant just before the trip to New York; that appellee there said he was not much interested in the proposed trade or as to whether he sold his stock; that appellee repeated this statement in New York. Hayes further testified that in 1932 when the second loan was made, appellee said in the presence of Wineberg and Lehn that he was satisfied to go along with the company; that he would dig in and work harder than ever and if necessary would go down with the ship.

Appellee denies all these conversations.

The burden was upon appellee to establish the new agreement, extension, assurance or whatever the name, the influence which decided appellee to waive his rights under the contract, may be called. We are making due allowance for those circumstances under which the smaller number of witnesses may furnish the preponderance of the evidence. Likewise are we taking into consideration all facts and circumstances in this record which seem to tend to corroborate appellee's version of what actually took place but we can find no warrant for the conclusion that appellee has met the burden in this matter. *Selamakos v. Victory Ice &*

*Ice Cream Co.,* 246 Ill. App. 178; *Huchette v. William-son County Coal Co.,* 188 Ill. App. 321; *Peaslee v. Glass,* 61 Ill. 94. On the other hand there is corroborated testimony denied only by appellee, that on divers times and in various places appellee said that he was "satisfied with his stock." "Glad he had it." "Wanted to keep it." etc.

Assuming, however, appellee's version of what took place to be a plenary warrant for his failure to perform in the first instance, he would then have a right to insist upon appellant carrying out its agreement to buy his stock within the new time fixed by the oral extension. What was this new time fixed? It was "on his demand," or "at any time hereafter." This, being interpreted, means a reasonable time. Elliott on Contracts, sec. 54, Vol. 1, page 91; *Estate Stove Co. v. Kenney,* 234 Ill. App. 366; *Quigley v. Macqueen & Co.,* 321 Ill. 124. It could not mean at any time hereafter without limit. Especially is this true in dealing with a subject matter so fluctuating and varying as stocks. The extension did not change the character of the contract. If the first was optional, as we have held, the second was equally so. *Kissack v. Bourke,* 224 Ill. 352. In appellant's own citation (*Norton Iron Works v. Wilson Steel Products Co.,* 232 Ill. App. 523) this doctrine is held.

We have read with much interest appellee's argument that the parties contemplated an entire cash payment of $80,000 and that the leaving of the stock with appellee was for the purpose of an extension of credit. We find nothing in the record to justify that assertion. It is true that the California cases cited so hold in those particular cases but we know of no Illinois decision to that effect except in cases where the intention of the parties is manifest. Even then there is something to do. Appellee could not sit by and wait until the money was brought to him.

We are loath to reverse cases under the circumstances of this one but we cannot escape the conclusion that the trial court misapprehended the legal effect of this contract in view of what was done under it.

The judgment of the circuit court is reversed and the cause remanded.

*Reversed and remanded.*